UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ESTATE OF M.D., by LOUIS DeCOSMO,
Administrator, and J.D., a minor, by LOUIS
DeCOSMO, his father and natural guardian,

                                        Plaintiffs,

            -v-

STATE OF NEW YORK, NEW YORK STATE
OFFICE OF CHILDREN AND FAMILY
SERVICES, DUTCHESS COUNTY,
DEPARTMENT OF COMMUNITY AND FAMILY
SERVICES OF DUTCHESS COUNTY, ROBERT
ALLERS, ALISON STERLING, MONICA
BALASSONE, ULSTER COUNTY, ULSTER
COUNTY DEPARTMENT OF SOCIAL SERVICES,
MICHAEL IAPOCE, KENNETH STAHLI, and
KAITLIN WOLFERT,

                                        Defendants.

No. 15-CV-6602 (KMK)

OPINION & ORDER

---

Appearances:

Michael D. Pomerantz, Esq.
Marrone Law Firm, L.L.C.
Philadelphia, PA
*Counsel for Plaintiff*

Robert L. Kraft, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants the State of New York and New York
State Office of Children and Family Services*

David L. Posner, Esq.
McCabe & Mack LLP
Poughkeepsie, NY
*Counsel for Defendants Dutchess County, Department of
Community and Family Services of Dutchess County,
Robert Allers, Alison Sterling, and Monica Balassone*

Michael T. Cook, Esq.
Cook, Netter, Cloonan, Kurtz & Murphy, P.C.
Kingston, NY
*Counsel for Defendants Ulster County, Ulster County*
*Department of Social Services, and Michael Iapoce*

KENNETH M. KARAS, District Judge:

Louis DeCosmo ("DeCosmo"), as administrator of the estate of M.D., and as father and natural guardian of J.D., a minor ("Plaintiffs"), bring this Action against Defendants the State of New York, New York State Office of Children and Family Services ("OCFS," and together with the State of New York, "State Defendants"), Dutchess County, Department of Community and Family Services of Dutchess County ("Dutchess DCFS"), Robert Allers ("Allers"), Alison Sterling ("Sterling"), Monica Balassone ("Balassone," and together with Dutchess County, Dutchess DCFS, Allers, and Sterling, the "Dutchess Defendants" ), Ulster County, Ulster County Department of Social Services ("Ulster DSS"), Michael Iapoce ("Iapoce," and together with Ulster County and Ulster DSS, the "Ulster Defendants"), Kenneth Stahli ("Stahli"), and Katlin Wolfert ("Wolfert"), alleging violations of Plaintiffs' constitutional rights. (*See* Second Am. Compl. ("SAC") (Dkt. No. 78).)[1]  Plaintiffs also bring claims of negligence, assault and battery, wrongful death, and survival action under state law. (*Id.*)  Before the Court are Motions To

---

[1] Plaintiff Louis DeCosmo is the administrator of the estate of M.D. and was the biological father of Decedent M.D., who was born in 2011 and died on August 5, 2014. (*See* SAC ¶¶ 1, 3.)  Plaintiff J.D. is a minor and the biological child of DeCosmo and is the brother of Decedent M.D.  (*Id.* ¶ 3.)  Defendant Allers is, and at all relevant times was, commissioner of DCFS; Defendant Sterling is, and at all relevant times was, a DCFS caseworker; Defendant Balassone is, and at all relevant times was, the supervisor of caseworker Sterling; Defendant Iapoce is, and at all relevant times was, commissioner of Ulster DSS.  (*Id.* ¶¶ 8–10, 13.)

Dismiss on behalf of State Defendants, Dutchess Defendants, and Ulster Defendants (the "Motions").  (*See* Dkt. Nos. 84, 86, 94.)[2]  For the reasons to follow, the Motions are granted.

## I.  Background

The following facts are taken from Plaintiffs' SAC and are assumed true for the purpose of resolving the instant Motions.

### A.  Factual Background

At the beginning of May 2014, DeCosmo, J.D., M.D., and Defendant Wolfert resided together in Poughkeepsie, New York.  (SAC ¶ 25.)  At the time, J.D. was four months old and Decedent M.D. was two and one-half years old.  (*Id.*)  The four had lived together since the birth of M.D.  (*Id.*)  Plaintiff DeCosmo, who is blind, was employed as a disc jockey at a local radio station and was an active parent to J.D. and M.D.  (*Id.* ¶¶ 26–27.)

For a period of time leading up to May 2014, DeCosmo and Wolfert's relationship "had deteriorated to the point where the couple was no longer close."  (*Id.* ¶ 26.)  On May 1, 2014, a verbal argument occurred between DeCosmo and Wolfert and Wolfert "struck DeCosmo in the face with her fist."  (*Id.* ¶ 28.)  Following the incident, Wolfert made an ex parte application to Dutchess County Family Court ("DCFC") for a restraining order that would prohibit DeCosmo from entering their home.  (*Id.* ¶ 29.)  On May 5, 2014, DCFC granted Wolfert's application, (*id.* ¶ 30), and on May 12, 2014, DCFC entered an amended temporary restraining order that granted DeCosmo access to the home, if accompanied by law enforcement, for the purpose of retrieving his personal property, (*id.* ¶ 31).  DeCosmo was not allowed, by virtue of a temporary restraining order, to continue to provide care to J.D. and M.D.  (*Id.* ¶ 32.)

---

[2] Defendant Wolfert is M.D.'s and J.D.'s mother; Defendant Stahli was a paramour of Wolfert's who was convicted of killing M.D.  Wolfert and Stahli do not join in the Motions.

As a result of the violent incident between DeCosmo and Wolfert, Defendants OCFS, DCFS, and Allers opened a child protective services ("CPS") file in relation to M.D. and J.D. (*Id.* ¶ 33.)[3]  The CPS file was assigned to Defendant Sterling, who was supervised by Defendant Balassone.  (*Id.* ¶¶ 34–35.)  Sterling visited the home and interviewed Wolfert twice a month from May to June 2014.  (*Id.* ¶¶ 36–37.)

In the beginning of June 2014, Wolfert began a relationship with Defendant Stahli.  (*Id.* ¶ 38.)[4]  During June 2014, Defendants Sterling and Balassone indicated in the CPS case file that Defendant Wolfert's home was safe for M.D. and J.D.  (*Id.* ¶ 43.)  Accordingly, Defendants Sterling and Balassone determined that the Dutchess CPS case file for M.D. and J.D. should be closed, (*id.* ¶ 46), and recommended against the provision of family support services, (*id.* ¶ 47).[5]

Plaintiffs allege that this was a reckless decision and resulted from a "lack of proper training, the overburdened nature of the CPS system[,] and the excessive caseload on social workers and supervisors."  (*Id.* ¶ 50.)  According to Plaintiffs, these deficiencies were "part of a longstanding and widespread custom and/or practice that was known to Defendants State of New York, OCFS, Dutchess County, DCFS, and Allers, acting through high-level policy[]makers with

---

[3] While Plaintiffs allege that the domestic incident was the reason for the Dutchess CPS investigation, Plaintiffs also cite Wolfert's testimony from Ulster County Family Court in which Wolfert stated that "there was an allegation [that] I didn't bathe [M.D. and J.D.] regularly . . . there was diaper rash on them consistently and . . . I didn't change [their] diaper[s] regularly." (SAC ¶ 36.)

[4] According to Plaintiffs, Stahli "had a history of domestic violence, theft[,] and drug abuse," and this information was "readily available to [Defendants]," though Plaintiffs offer no specifics in support of these claims.  (SAC ¶¶ 39–40.)

[5] According to Plaintiffs, Sterling and Balassone "actively . . . concealed the fact that Defendant Stahli was a presence in the lives of Defendant Wolfert and M.D. and J.D. from . . . DeCosmo."  (SAC ¶ 45.)

final authority or so widespread that they should have known of such custom and/or practice of incomplete and inaccurate CPS investigations." (*Id.* ¶ 53.)

On or around July 6, 2014, Wolfert moved with M.D. and J.D. to Milton, New York, in Ulster County. (*Id.* ¶¶ 57, 60.)[6] Stahli also moved into Wolfert's new home with her children and became their sole caretaker while Wolfert worked during the day. (*Id.* ¶¶ 60–61.) During the following month, Wolfert and Stahli "engaged in a drug fueled pattern of abuse, physical battering[,] and torture." (*Id.* ¶ 62.) On August 5, 2014, an emergency medical technician and paramedic were called to Wolfert's home and encountered an unresponsive M.D. with visible bruising on his body. (*Id.* ¶ 63.) The paramedic attempted to perform life-saving measures on M.D., but they were unsuccessful. (*Id.* ¶ 64.) An autopsy performed on M.D. revealed that he had suffered internal bleeding from a lacerated pancreas and liver, brain injuries, a lacerated frenulum, a subdural hematoma, and a broken rib. (*Id.* ¶ 65.) The post-mortem examination also revealed the presence of heroin in M.D.'s body. (*Id.*)

An examination of J.D. at the time of M.D.'s death revealed "a double ear infection, a 101 [degree] fever, severe eczema . . . and very inflamed nipples, with a hickey-type injury about two inches below the right nipple." (*Id.* ¶ 71.) Following M.D.'s death, J.D. was removed from Wolfert's home and is currently in the custody of DeCosmo. (*Id.* ¶ 70.) On May 8, 2015, following a jury trial in Ulster County, Stahli was convicted of the murder of M.D. and is currently serving a sentence of 25 years to life in prison. (*Id.* ¶¶ 66, 73.)

Plaintiffs assert nine counts against various Defendants for violation of Plaintiffs' rights under the Fourth and Fourteenth Amendments, supervisory liability, *Monell* liability, assault and

---

[6] Plaintiffs allege that Dutchess Defendants should have communicated with Ulster County officials about this case or, in fact, should have transferred it to Ulster County. (SAC ¶ 59.)

battery, negligence, wrongful death, and survival action, (*see id.* ¶¶ 78–132), seeking monetary and punitive damages, as well as interest, costs, and attorney's fees, (*see id.*).

### B.  Procedural History

Plaintiffs filed their initial Complaint on August 20, 2015.  (Dkt. No. 1.)[7]  Plaintiffs filed an Amended Complaint on September 1, 2015, (Dkt. No. 28), and the Second Amended Complaint on February 8, 2016.  (Dkt. No. 78.)  On March 28, 2016, State Defendants filed a Motion To Dismiss and accompanying memorandum of law, (Dkt. Nos. 84–85), and on the same day, Dutchess Defendants filed a Motion To Dismiss and accompanying papers, (Dkt. Nos. 86–92).  On March 29, 2016, Ulster Defendants filed a Motion To Dismiss and accompanying papers.  (Dkt. Nos. 94–98.)  On May 12, 2016, Plaintiffs filed oppositions to each Motion To Dismiss, (Dkt. Nos. 99–101), and State, Dutchess, and Ulster Defendants each filed a reply on May 26, 2016, (Dkt. Nos. 102–04).

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

---

[7] This Action was originally assigned to Judge Jesse Furman of the District Court for the Southern District of New York in the Manhattan courthouse.  (*See* Dkt. (minute entry for Aug. 21, 2015).)  Pursuant to an Order issued August 26, 2015, the case was reassigned to the White Plains courthouse.  (*See* Order (Dkt. No. 27).)  On September 11, 2015, the case was assigned to this Court.  (*See* Dkt. (minute entry for Sept. 11, 2015).)

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked

assertions devoid of further factual enhancement."  *Id.* (alteration and internal quotation marks

omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief

above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated

adequately, it may be supported by showing any set of facts consistent with the allegations in the

complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that

is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from

conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679

("Determining whether a complaint states a plausible claim for relief will . . . be a context-

specific task that requires the reviewing court to draw on its judicial experience and common

sense.  But where the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader

is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P.

8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-

technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a

plaintiff armed with nothing more than conclusions.").

 "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the

factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and

"draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992

F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145

(2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must

confine its consideration to facts stated on the face of the complaint, in documents appended to

the complaint or incorporated in the complaint by reference, and to matters of which judicial

notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

> ### B.  Analysis

> #### 1.  Plaintiffs' Claims Against State Defendants

As noted, Plaintiffs allege that the "deficiencies in the CPS investigation . . . which brought about the death of M.D. and the injuries suffered by J.D. . . . were part of a longstanding and widespread custom and/or practice that was known to Defendants State of New York . . . [and] OCFS . . . , acting through high-level policy[]makers with final authority [who] deliberately chose not to pursue a different course of action."  (SAC ¶ 54.)  Similarly, Plaintiffs aver that "the active and affirmative conduct of Defendants Alison Sterling and Monica Balasone were the result of decisions by Defendants State of New York . . . [and] OCFS . . . , acting through high-level policy[]makers with final authority and/or acquiescing to a longstanding custom and/or practice known to such high-level policymakers."  (*Id.* ¶ 55.)  Plaintiffs further allege that during the final weeks of Decedent M.D.'s life, witnesses to the abuse committed by Defendants Wolfert and Stahli "called anonymous child abuse 'tip lines' maintained by Defendants State of New York" and that despite receiving such information, "Defendant[] State of New York . . . did not initiate any CPS investigation or assign any caseworker."  (*Id.* ¶ 69.)

In their Motion To Dismiss, State Defendants argue that "Plaintiffs' claims against State Defendants are barred by the Eleventh Amendment."  (*See* Mem. of Law in Supp. of State Defs.' Mot. To Dismiss 5 (Dkt. No. 85).)  The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or

Subjects of any Foreign State." U.S. Const. amend. XI. The Amendment prohibits suits against a state in federal court unless the state consents or there has been a valid abrogation of its sovereign immunity by an act of Congress. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01 (1984). "[Section] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States; nor does it have a history which focuses directly on the question of state liability and which shows that Congress considered and firmly decided to abrogate the Eleventh Amendment immunity of the States." *Quern v. Jordan*, 440 U.S. 332, 345 (1979); *see also Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (affirming dismissal of § 1983 claims for damages against state on Eleventh Amendment grounds).

State sovereign immunity extends to state agencies that constitute "arms of the state." *See N. Ins. Co. of N.Y. v. Chatham County*, 547 U.S. 189, 193 (2006); *see also Jones v. N.Y. State Div. of Military & Naval Affairs*, 166 F.3d 45, 49 (2d Cir. 1999) (holding that the Eleventh Amendment bars § 1983 suits against state agencies). Here, OCFS is properly characterized as an "arm of the state." *See Hale v. Mann*, 219 F.3d 61, 67–69 (2d Cir. 2000) (granting immunity under the Eleventh amendment to OCFS in the context of a Family Medical Leave Act suit); *Rivera v. Mattingly*, 604 F. Supp. 2d 634, 638 (S.D.N.Y. 2009) (finding official capacity claims against OCFS Commissioner barred by Eleventh Amendment).

In response to State Defendants' Motion, Plaintiffs argue that "[t]he Eleventh Amendment . . . is not truly a limit on subject matter jurisdiction, but rather a block on the exercise of jurisdiction that still exists." (Pls.' Resp. in Opp'n to Defs. State of New York and New York State Office of Children and Family Servs.' Mot. To Dismiss ("Pls.' State Opp'n") 2 (Dkt. No. 101).) Plaintiffs offer no further explanation of this claim, whatever it is. Plaintiffs

further assert that OCFS's assertions of immunity are unavailing because under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), a municipal agency is considered a "person" subject to suit, (Pls.' State Opp'n 2–3). As the Supreme Court made clear in *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989), "it does not follow that if municipalities are persons [under *Monell*] then so are States." *Id.* at 70. "States are protected by the Eleventh Amendment while municipalities are not . . . and . . . [the] holding in *Monell* [was limited] to local government units which are not considered part of the State for Eleventh Amendment purposes." *Id.* (citation and internal quotation marks omitted).

Because New York State has not waived its Eleventh Amendment immunity, nor has Congress abrogated the state's immunity under § 1983, this Court lacks subject matter jurisdiction over Plaintiffs' claims against the State of New York and OCFS. Accordingly, Plaintiffs' claims against the State Defendants are dismissed.

### 2. Plaintiffs' Claims Against Dutchess Defendants

#### a. Claims against Dutchess DCFS

Dutchess Defendants argue that the claims against Dutchess DCFS must be dismissed because it lacks the capacity to be sued. (*See* Dutchess Defs.' Mem. 29; Dutchess Cty. Defs.' Reply Mem. of Law ("Dutchess Defs.' Reply") 5 (Dkt. No. 103).) The Court agrees.

"[U]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality, and therefore, cannot sue or be sued." *Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002). Here, because Dutchess DCFS is an administrative arm of Dutchess County, and not an independent legal entity, it lacks the capacity to be sued. *See, e.g.*, *Bey v. New York*, No. 11-CV-3296, 2013 WL 3282277, at *5 (E.D.N.Y. June 25, 2013) (dismissing claims against Nassau

County Child Protective Services); *Teitelbaum v. Katz*, No. 12-CV-2858, 2013 WL 563371, at *5 (S.D.N.Y. Feb. 11, 2013) (dismissing claims against Orange County Child Protective Services).

While the Court notes that it could substitute Defendant Dutchess County for DCFS, *see* Fed. R. Civ. P. 21 (providing that "on its own, the court may at any time, on just terms, add . . . a party"), each federal claim Plaintiffs assert against DCFS, is also brought against Dutchess County, (*see* SAC ¶¶ 78–84, 108–13).  Accordingly, Plaintiffs' claims against Dutchess DCFS are dismissed.

### b.  Fourth Amendment

Dutchess Defendants assert that Plaintiffs' failure to respond to the defenses to Plaintiffs' claims under the Fourth Amendment constitutes abandonment of those claims and thus warrants their dismissal.  (*See* Dutchess Defs.' Reply 1.)  "Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers defendants' arguments for dismissing such a claim," *Robinson v. Fischer*, No. 09-CV-8882, 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010) (report and recommendation), "[h]owever, in the exercise of its discretion, the Court will not deem the claim abandoned," *Marro v. Nicholson*, No. 06-CV-6644, 2008 WL 699506, at *4 n.6 (E.D.N.Y. Mar. 12, 2008), but will instead address its merits.

Plaintiffs assert that M.D. and J.D. were "victims of unreasonable and/or unlawful seizure and/or detainment at the home of [D]efendant Wolfert while she was in a romantic relationship with Defendant Stahli" and that "[t]he conduct of . . . Defendants in not permitting Decedent M.D. and Plaintiff J.D. to leave the premises . . . deprived [them] of their rights under the laws of

the Constitution."  (SAC ¶ 81.)   In response, Dutchess Defendants assert that "[t]he Fourth

Amendment has no applicability" to Plaintiffs' claims.  (Dutchess Defs.' Mem. 11–12.)

    The threshold question is whether any actions of Dutchess Defendants constituted a

"seizure" for Fourth Amendment purposes.  *See Kyllo v. United States*, 533 U.S. 27, 31 (2001)

(noting that "the antecedent question" in a Fourth Amendment inquiry is whether the

governmental conduct in question constituted a search or seizure).  Only if the conduct can be

defined as such does the Court then analyze whether the seizure was reasonable under the Fourth

Amendment.  *See Illinois v. Caballes*, 543 U.S. 405, 409–10 (2005) (ending the Fourth

Amendment inquiry after determining that the contested police action did not constitute a

search).  "A 'seizure' triggering the Fourth Amendment's protections occurs only when

government actors have, 'by means of physical force or show of authority, . . . in some way

restrained the liberty of a citizen.'"  *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)

(alteration in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).  This happens when,

"in view of all of the circumstances surrounding the incident, a reasonable person would have

believed that he was not free to leave."  *Kia P. v. McIntyre*, 235 F.3d 749, 762 (2d Cir. 2000)

(internal quotation marks omitted).  As one court has explained:

> Factors that have been found relevant in determining whether a seizure has occurred
> include: "threatening presence of several officers; the display of a weapon; physical
> touching of the person [by] the officer; language or tone indicating that compliance
> with [the] officer was compulsory; prolonged retention of a person's personal
> effects, such as airplane tickets or identification; and a request by an officer to
> accompany him to the police station or a police room."

*Dejesus v. Village of Pelham Manor*, 282 F. Supp. 2d 162, 169 (S.D.N.Y. 2003) (quoting *United

States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990)).  Courts also should consider the age of the

person being detained because "'whether the person . . . is a child or an adult'" is "relevant" to

whether a person would feel free to leave.  *United States v. Little*, 18 F.3d 1499, 1505 n.6 (10th

Cir. 1994); *see also Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005) (noting that the plaintiff's "encounter" with police officers should be viewed "through the eyes of a reasonable sixteen-year-old"); *Doe v. Heck*, 327 F.3d 492, 510 (7th Cir. 2003) (asking whether a "reasonable child" being questioned at school about abuse allegations would have felt free to leave); *Phillips v. County of Orange*, 894 F. Supp. 2d 345, 363 (S.D.N.Y. 2012) (finding "a reasonable five-year-old child would not have thought she was free to leave or decline the adults' questioning").

While lower courts within the Second Circuit have held that a *deprivation* of custody constitutes a seizure under the Fourth Amendment, *see Estiverne v. Esernio-Jenssen*, 833 F. Supp. 2d 356, 375–76 (E.D.N.Y. 2011) (finding that there was an issue of fact as to whether parents were free to take their child from a hospital, and thus allowing a Fourth Amendment seizure claim to go forward); *E.D. ex rel. V.D. v. Tuffarelli*, 692 F. Supp. 2d 347, 366 (S.D.N.Y. 2010) ("The removal of a child, even on a temporary basis, may constitute a 'seizure' for the purpose of the Fourth Amendment's prohibition against unlawful search and seizure."), *aff'd*, 408 F. App'x 448 (2d Cir. 2011), the Court has not identified any precedent within the Second Circuit addressing whether a failure of CPS workers to *remove* a child from an allegedly abusive home constitutes a seizure, such that the child can state a valid Fourth Amendment claim.

Here, Plaintiffs fail to allege *any* affirmative conduct of Dutchess Defendants to support assertions that they did "not permit[] Decedent M.D. and Plaintiff to leave the premises."  (SAC ¶ 81.)  Of the factors pertinent in determining whether seizure has occurred—threatening presence of officers, display of a weapon, physical contact, language or tone urging compulsory compliance, prolonged retention of personal property, officer escort to a police station—*see*

*Dejesus*, 282 F. Supp. 2d at 169, none is present here.  Plaintiffs have failed to adequately plead

any facts that support a claim that M.D. or J.D.'s liberty "was restrained," let alone "by means of

physical force or show of authority" on behalf of any of Dutchess Defendants.  *Graham*, 490

U.S. at 395 n.10.  M.D. and J.D. were in the home of their legal guardian, Defendant Wolfert.  In

the absence of anything beyond conclusory allegations that M.D. and J.D. "were the victims of

unreasonable and/or unlawful seizure and/or detainment at the home" of their legal guardian, the

Court finds the allegations are insufficient to state a claim under the Fourth Amendment.  *See*

*Zimmerman v. Wolczyk*, No. 15-CV-1437, 2016 WL 3702987, at *6 n.11 (N.D.N.Y. July 8,

2016) ("[The] [p]laintiff's conclusory assertion that his confinement constituted an unreasonable

seizure . . . does not give rise to a cognizable Fourth Amendment claim against these

defendants." (alterations and internal quotation marks omitted)).  Plaintiffs' Fourth Amendment

claims against Dutchess Defendants are therefore dismissed.

### c.  Fourteenth Amendment

Plaintiffs allege that Defendants Sterling and Bassalone violated M.D.'s and J.D.'s

substantive rights to due process under the Fourteenth Amendment.  (SAC ¶¶ 85–107.)  In

response, Dutchess Defendants assert that Plaintiffs fail to state a claim and additionally, fail to

plead that Sterling and Bassalone were the proximate cause of M.D.'s and J.D.'s injuries because

of the intervening conduct of Defendant Wolfert.  (Dutchess Defs.' Mem. 13–19.)

The Second Circuit has emphasized that "[o]nly an affirmative act can amount to a

violation of substantive due process, because the Due Process Clause is phrased as a limitation

on the State's power to act, not as a guarantee of certain minimal levels of safety and security."

*Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007) (internal quotation marks omitted).

Moreover, state action resulting in bodily harm is not a substantive due process violation unless

14

the state "action was so 'egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).  Thus, it is insufficient to allege that a state actor failed to protect an individual, even from a known danger of bodily harm or failed to warn that individual of such danger.  *See Collins v. City of Harker Heights*, 503 U.S. 115, 125–29 (1992) (holding that there was no due process violation where the plaintiff alleged that the city failed to properly train or warn its employees of known dangers that resulted in a sanitation worker's asphyxiation).  This includes dangers arising from private parties.  As the Supreme Court explained in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the purpose of the Due Process Clause of the Fourteenth Amendment is "to protect the people from the State, not to ensure that the State protected them from each other."  *Id.* at 196.

In *DeShaney*, the seminal case on substantive due process, the Supreme Court considered "when, if ever, the failure of a state or local government entity or its agents to provide an individual with adequate protective services constitutes a violation of the individual's due process rights."  *Id.* at 194.  There, defendant Winnebago County Department of Social Services ("Winnebago DSS") received information that four-year-old Joshua DeShaney was being abused by his father, his guardian.  *Id.* at 192.  Following admission to the hospital with abrasions and bruises, Joshua's examining physician notified Winnebago DSS, and a juvenile court placed Joshua in temporary custody of the hospital.  *Id.*  Following consultation with a pediatrician, a child psychologist, and a police detective, Winnebago DSS determined that there was insufficient evidence of abuse to warrant keeping Joshua in custody of the State, and returned Joshua to his father's custody.  *Id.* at 192.  However, the abuse continued and Joshua suffered a severe beating that resulted in permanent brain damage.  *Id.* at 193.  Joshua and his mother sued

15

Winnebago DSS and various individual employees, claiming that "by failing to intervene to protect [Joshua] against a risk of violence at his father's hands of which they knew or should have known," the defendants violated Joshua's substantive due process rights.  *Id.*

The Court held that the failure to remove Joshua from his father's custody, despite the defendants' knowledge of abuse, did not constitute a violation of substantive due process.  *Id.* at 202.  The Court noted that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors," *id.* at 195, and that the language of the Clause "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means," *id.*  "If the Due Process Clause does not require the State to provide its citizens with particular protective services," the Court stated, "it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them."  *Id.* at 196–97.

However, "in exceptional circumstances a governmental entity may have a constitutional obligation to provide . . . protection, either because of a special relationship with an individual, or because the governmental entity itself has created or increased the danger to the individual." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir. 1993) (citation omitted) (citing *DeShaney*, 489 U.S. at 198, 201).  Here, Plaintiffs contend that both the "state-created danger" and "special relationship" exceptions apply.  (*See* SAC ¶¶ 85–99; Pls.' Resp. in Opp'n to Defs.' Dutchess Cty., Dep't of Cmty. and Family Servs. of Dutchess Cty., Robert Allers, Alison Sterling and Monica Balassone's Mot. To Dismiss ("Pls.' Dutchess Opp'n") 7–12 (Dkt. No. 99).) Plaintiffs assert that Defendants Sterling and Balassone are culpable because "they affirmatively exercised their authority in a manner that created a danger to M.D. and J.D." and that "M.D.'s and J.D.'s status as the subjects of a CPS file and/or investigation created a special relationship

that existed between Decedent M.D., J.D. and Defendants Sterling and Balassone."  (SAC ¶¶ 90–91.)  The Court addresses each exception in turn.

### i.  State-Created Danger

The early incantations of state-created danger involved law enforcement officers encouraging private actors to inflict harm upon others.  In the wake of *DeShaney*, the Second Circuit first recognized the notion of a state-created danger in *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993), *overruled on other grounds by Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993).  In *Dwares*, the plaintiff alleged that police officers conspired with "skinheads" to assault a group of flag-burners expected to be at a public protest.  In particular, the plaintiff claimed that the police officers who were present when these skinheads attacked plaintiff while he attended the demonstration (and supported those who burned flags) had previously communicated to the skinheads that the police would not interfere with or arrest the skinheads for assaulting any flag-burners, "unless they got completely out of control."  *Id.* at 96–97.  According to the *Dwares* court, such "a prearranged official sanction of privately inflicted injury would surely have violated the victim's rights under the Due Process Clause."  *Id.* at 99.

The next application of the state-created danger exception was in *Hemphill v. Schott*, 141 F.3d 412 (2d Cir. 1998).  Describing state-created danger liability as arising when a "state actor aids and abets a private party in subjecting a citizen to unwarranted physical harm," *id.* at 418, the *Hemphill* court found such liability where the police not only returned a firearm to a robbery victim, but then drove him to the scene of the robber's arrest, whereupon the robbery victim shot the robber, *id.* at 418–20.  The following year, in *Snider v. Dylag*, 188 F.3d 51 (2d Cir. 1999), the

17

Second Circuit held that a prison guard who told inmates that it was "open season" on a prisoner created a danger when inmates later beat up that prisoner. *Id.* at 55.

The reach of state-created liability was extended in *Pena*, 432 F.3d 98.  In *Pena*, family members of pedestrians who were killed by an intoxicated off-duty police officer brought a § 1983 action against other officers, claiming that they sanctioned the intoxicated officer's alcohol abuse and driving under the influence, in violation of the pedestrians' substantive due process rights. *Id.* at 103–04.  In analyzing the plaintiffs' theory of liability, the *Pena* court broke down the categories of officers into those who merely "failed to intercede on the day of the accident," and those who encouraged, even if implicitly, the intoxicated officer to drink excessively and drive. *Id.* at 110–11.  In making this distinction, the court recognized that in applying the state-created danger doctrine, the Second Circuit has "sought to tread a fine line between conduct that is 'passive' as in *DeShaney* and that which is 'affirmative' as in *Dwares*," *id.* at 109, an exercise that the court acknowledged can be "difficult," *id.* at 110.  Nonetheless, the court had little trouble in holding that the plaintiffs' allegations regarding officers who either failed to intercede, or otherwise "stood by and did nothing" to address the intoxicated officer's previous misconduct were "inadequate to state a substantive due process claim." *Id.* (internal quotation marks omitted).  As the court emphasized, "[a] failure to interfere when misconduct takes place, and no more, is not sufficient to amount to a state *created* danger." *Id.* (emphasis in original).

Here, any theory of state-created danger is fatally undermined by the absence of any allegation that Defendants Sterling and Balassone affirmatively communicated, even implicitly, to Stahli that abuse against J.D. and M.D. was permissible.  "The affirmative conduct of a government official may give rise to an actionable due process violation if it communicates,

explicitly or implicitly, official sanction of private violence." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 429 (2d Cir. 2009) (discussing the state-created danger doctrine in a case where police officers were alleged to have implicitly encouraged the perpetration of domestic abuse); *see also Pena*, 432 F.3d at 111 ("[W]hen . . . state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under [§] 1983 for injury caused by the misconduct under *Dwares*."); *Jones v. Nickens*, 961 F. Supp. 2d 475, 487 (E.D.N.Y. 2013) ("Missing from [the plaintiff's] claim, however, is any allegation that the [defendants] took the kind of affirmative action that would otherwise imbue them with a duty to protect [the decedent] from private abuse."). This communication gap is the critical missing link between the danger M.D. and J.D. faced and the responsibility for creating it. While "'[t]he boundaries of the state created danger exception to *DeShaney* are not entirely clear,' . . . the exception does require a government defendant to 'either be a substantial cause of the danger . . . or at least enhance it in a material way.'" *Scruggs v. Meriden Bd. of Educ.*, No. 03-CV-2224, 2007 WL 2318851, at *12 (D. Conn. Aug. 10, 2007) (second alteration in original) (quoting *Clarke v. Sweeney*, 312 F. Supp. 2d 277, 293 (D. Conn. 2004)). Here, the danger (and harm) to M.D. and J.D. came from Defendant Stahli and there is no allegation that Sterling or Balassone did anything to *create* that danger, even if they allegedly failed to, and could, prevent the danger.

In *DeShaney*, the Supreme Court recognized that the State had played no role in creating the dangers to Joshua, "nor did it do anything to render him more vulnerable to" such dangers.

*DeShaney*, 489 U.S. at 201.[8]  The same is true here.  Plaintiffs' allegations fall short of

sustaining a claim that Sterling's or Balassone's actions, or lack of action, substantially caused or

enhanced the danger to M.D. and J.D.  At worst, their actions were insufficient to prevent the

danger, thus placing this case squarely in the ambit of *DeShaney*.

### ii.  Special Relationship

*DeShaney* also recognized the so-called "special relationship" exception to the general

rule that the Due Process Clause does not impose an affirmative obligation to protect its citizens

from private tortfeasors.  The Supreme Court has described this relationship as follows:

> [W]hen the State takes a person into its custody and holds him there against his
> will, the Constitution imposes upon it a corresponding duty to assume some
> responsibility for his safety and general well-being. . . .  The rationale for this
> principle is simple enough: when the State by the affirmative exercise of its power
> so restrains an individual's liberty that it renders him unable to care for himself,
> and at the same time fails to provide for his basic needs—e.g., food, clothing,
> shelter, medical care, reasonable safety—it transgresses the substantive limits on
> state action set by the . . . Due Process Clause.

*DeShaney*, 489 U.S. at 199–200 (italics omitted).  In *Deshaney*, the Supreme Court held that the

special relationship exception did not apply, because "[t]he affirmative duty to protect arises not

from the State's knowledge of the individual's predicament or from its expression of intent to

help him, but *from the limitation which it has imposed on his freedom to act on his own behalf*."

*Id.* at 200 (emphasis added).

Most often, substantive due process claims arise in the child-*removal* context.  "[A]

'special relationship' . . . may exist between the state and a child when a state official places the

child in foster care."  *S.W. ex rel. Marquis-Abrams v. City of New York*, 46 F. Supp. 3d 176, 203

---

[8] Moreover, in *DeShaney*, the defendants were aware of previous instances of abuse, at
least one of which resulted in a trip to the hospital.  While Plaintiffs allege that "[a]t all relevant
times, Defendant Stahli had a history of domestic violence, theft and drug abuse," (SAC ¶ 39),
there are no allegations that Stahli previously abused children, or abused M.D. or J.D.

(E.D.N.Y. 2014); *see also Doe v. N.Y.C. Dep't of Soc. Servs.*, 649 F.2d 134, 141–42 (2d Cir.

1981); *Smith v. Town of East Haven*, No. 01-CV-1375, 2005 WL 677284, at *4 (D. Conn. Mar.

22, 2005) ("The 'special relationship' exception applies to persons in state custody, such as to

foster children, or persons who have their freedom of movement limited by the state, e.g.

undercover witnesses."), *reconsideration granted*, 2005 WL 2406011 (D. Conn Sept. 28, 2005).

Here, as noted above, M.D. and J.D. were not placed in foster care, and therefore, were not in the

custody of the State.  "Accordingly, [Plaintiffs] cannot assert a § 1983 claim against the . . .

[D]efendants based on the 'special relationship' exception."  *S.W. ex rel. Marquis-Abrams*, 46 F.

Supp. 3d at 203; *see also Cruz v. N.Y.C. Hous. Auth.*, No. 03-CV-8031, 2004 WL 1970143, at *8

(S.D.N.Y. Sept. 3, 2004) (noting "the Second Circuit has . . . only recognized 'custodial

relationships such as a prison and inmate or a mental institution and involuntarily committed

patient, and the relationship between a social service agency and foster child' as imposing an

affirmative duty to protect on state actors" (quoting *Ying Jing Gan*, 996 F.2d at 533)).  As such,

the conduct of Defendants Sterling and Balassone does not rise to the level of a "*limitation on

[M.D. and J.D.'s] freedom* to act on [their] own behalf."  *DeShaney*, 489 U.S. at 200 (emphasis

added).  As Plaintiffs have failed to demonstrate that Defendants Sterling and Balassone violated

M.D. and J.D.'s constitutional right to substantive due process and neither exception applies, the

Court grants Dutchess Defendants' Motion To Dismiss on this ground.

### d.  Supervisory and *Monell* Liability

Plaintiffs bring a claim for supervisory liability against Defendants Allers and Balassone,

asserting that they "knew or should have known that their directions and/or acquiescence to the

conduct of those over whom they exercised supervisory control would have the effect of

depriving M.D. and J.D. of their rights under the law of the Constitution . . . ."  (SAC ¶ 106; *see*

*also* Pls.' Dutchess Opp'n 13–14.)  Defendants argue that Plaintiffs "fail[] to allege sufficient personal conduct by Allers to state a supervisory liability claim" and that the claim for supervisory liability against Defendant Balassone should be dismissed as Plaintiffs fail to state claims for a constitutional violation.  (Dutchess Defs.' Mem. 19–20 & n.8; *see also* Dutchess Defs.' Reply 6–7.)

"It is well settled in [the Second] Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks omitted).  While "[i]n certain situations, a supervisor may be held liable under [§] 1983 for a constitutional violation committed by a subordinate," *Santana v. City of Hartford*, 283 F. Supp. 2d 720, 728 (D. Conn. 2003), "the doctrine of respondeat superior standing alone does not suffice to impose liability for damages under [§] 1983 on a defendant acting in a supervisory capacity," *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir. 2003).

"[F]or a supervisor to be liable under [§] 1983, there must have been an underlying constitutional deprivation."  *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999); *see also Clarke*, 312 F. Supp. 2d at 298 ("[O]ne of the requirements of supervisory liability . . . is that the supervisor's action (or inaction) must have led to a deprivation of constitutional rights.").  As detailed *supra*, there was no constitutional violation of M.D.'s and J.D.'s rights arising from Sterling's and Balassone's conduct.  *See Elek v. Incorporated Village of Monroe*, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) ("Absent an underlying constitutional violation, there is no cognizable claim for supervisor liability." (internal quotation marks omitted)).  Accordingly, there can be no supervisory liability for Defendants Allers or Balassone based on the actions of those over whom they exercised supervisory control.

The same is true as to Plaintiffs' claims under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  Plaintiffs allege that Dutchess County and DCFS failed to: (1) "properly screen, hire, employ and/or retain employees . . . with sufficient skill and/or fitness for duty to serve as case[]workers and/or supervisors"; (2) "properly train and/supervise employees"; (3) "properly implement appropriate policies, practices, and/or procedures"; and (4) "properly train supervisors managers and other personnel to properly and adequately oversee the activities of caseworkers."  (SAC ¶ 111.)  Defendants assert that Plaintiffs fail to allege facts sufficient to state a claim.  (*See* Dutchess Defs.' Mem. 22–23; Dutchess Defs.' Reply 7–8.)

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right."  *Sykes v. Bank of Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013).  "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell*, 436 U.S. at 691.  Thus,

> to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury.

*Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *cf. Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against government agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *adopted by* 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011); *Arnold v. Westchester County*, No. 09-CV-3727, 2010 WL 3397375, at *9 (S.D.N.Y. Apr. 16, 2010) (dismissing a claim against the county because the complaint "[did] not allege the existence of an unconstitutional custom or policy"), *adopted sub nom. Arnold v. Westchester Cty. Dep't of Corr.*,

2010 WL 3397372 (S.D.N.Y. Aug. 25, 2010).  The fifth element—that an official policy of the municipality caused the constitutional injury—reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor."  *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right.").  In other words, a municipality may not be held liable under § 1983 "by application of the doctrine of respondeat superior."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong").  Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").  Importantly, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).

"If a plaintiff alleges no constitutional violation, or a district court finds that the plaintiff has inadequately alleged one, the *Monell* claim fails."  *Williams v. City of New York*, No. 11-CV-6679, 2012 WL 3245448 at *12 (S.D.N.Y. Aug. 8, 2012); *see also Segal*, 459 F.3d at 219 ("Because the district court properly found no underlying constitutional violation, its decision

24

not to address the municipal defendants' liability under *Monell* was entirely correct."); *Vassallo*,

591 F. Supp. 2d at 202 (holding that because there was no constitutional violation by the

individual defendants, no *Monell* claim remained against the municipality).  As Plaintiffs' have

failed to allege a constitutional violation on behalf of Dutchess Defendants, (*see supra*),

Plaintiffs claims pursuant to *Monell* are dismissed.[9]

 Even if Plaintiffs had plausibly alleged a constitutional violation, the *Monell* claim would

be dismissed.  First, Plaintiffs' allegations about Dutchess County's policies and training

practices are devoid of any specifics.  For example, there is no particular deficiency in the

training of its employees that is identified.  Instead, they represent the type of conclusory

allegations that are routinely found to be insufficient.  *See Moore v. City of New York*, No. 08-

CV-8879, 2010 WL 742981, at *6 (S.D.N.Y. Mar. 2, 2010) ("Allegations that a defendant acted

pursuant to a 'policy' or 'custom' 'without any facts suggesting the policy's existence, are

plainly insufficient.'" (quoting *Missel v. County of Monroe*, 351 F. App'x 543, 545 (2d Cir.

2009))).  Second, Plaintiffs have, at most, identified a single instance of allegedly unlawful

conduct by Dutchess County employees.  Plaintiffs have not identified any practice or pattern of

unlawful conduct, or the actionable conduct of a particular policymaker that could trigger *Monell*

liability here.  *Newton*, 566 F. Supp. 2d at 271 ("[A] custom or policy cannot be shown by

pointing to a single instance of unconstitutional conduct by a mere employee of the

[municipality]."); *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality

opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose

---

 [9] Dutchess Defendants contend that Allers, Sterling, and Balassone have not been
properly served with process.  (*See* Dutchess Defs.' Mem. 28–29.)  As the Court has resolved the
dispute on the merits of Plaintiffs' claims, it need not address the procedural deficiencies in
service.

liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

### 3.  Plaintiffs' Claims Against Ulster Defendants

#### a.  Claims against Ulster DSS

For the reasons given above, Plaintiffs' claims against Ulster DSS must be dismissed because, like Ulster DCFS, Ulster DSS lacks the capacity to be sued.  *See Davis*, 224 F. Supp. 2d at 477 ("[U]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and therefore, cannot sue or be sued.").

#### b.  *Monell* Liability

Plaintiffs' only remaining federal claim against Ulster Defendants is asserted against Ulster County for liability pursuant to *Monell* for violations of M.D.'s and J.D.'s rights under the Fourth and Fourteenth Amendments.  (*See* SAC ¶¶ 108–13; *see also* Pls.' Resp. in Opp'n to Defs.' Ulster Cty., Ulster Cty. Dep't of Soc. Servs. and Michael Iapoce's Mot. To Dismiss 13–14 (Dkt. No. 100).)

Plaintiffs assert that "[u]pon information and belief, . . . during the final weeks of M.D.'s life, other individuals witnessed incidents and results of abuse that were being committed by Defendants Wolfert and Stahli and called anonymous child abuse 'tip lines' maintained by Defendants . . . Ulster County, Ulster DSS and/or Iapoce."  (SAC ¶ 69.)  Plaintiffs aver that

"[d]espite the provision of information about abuse, [Ulster] Defendants . . . did not initiate any CPS investigation or assign any caseworker." (*Id.*)

Ulster Defendants' failure to investigate the alleged calls to anonymous tip lines does not rise to the level of a violation of substantive due process. Indeed, in *DeShaney*, "suspicion that Joshua was being abused . . . was relayed to [the defendant] for investigation and possible action." 489 U.S. at 208. Such information came from police, emergency room personnel, neighbors, and social workers, *id.* at 208–09, but the Court held that "[t]he most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them," *id.* at 203.

For the reasons set forth above as applied to Dutchess Defendants, Plaintiffs' fail to allege a constitutional violation on the part of Ulster Defendants. Thus, Plaintiffs' *Monell* claim is dismissed.[10]

### 4.  Plaintiffs' State-Law Claims

Plaintiffs also assert claims of negligence, wrongful death, and a survival action under New York state law against certain Dutchess and Ulster Defendants. (*See* SAC ¶¶ 117–18, 121–32.) Because the Court has dismissed Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."); *McGugan v. Aldana–Bernier*, No. 11-CV-342, 2012 WL 1514777, at *8 (E.D.N.Y. Apr. 30, 2012) ("[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent

---

[10] As the Court finds that Plaintiffs have failed to state a claim for violation of their constitutional rights, the Court declines to consider Defendants' arguments that they are entitled to qualified immunity. (*See* Dutchess Defs.' Mem. 24–27; Ulster Defs.' Mem. 8–10.)

jurisdiction over remaining state law claims and dismissing them without prejudice."), *aff'd*, 752 F.3d 224 (2d Cir. 2014).

### C.  Dismissal With Prejudice

A complaint should be dismissed without prejudice if the pleading, "'liberally read,' suggests that the plaintiff has a claim that []he has inadequately or inartfully pleaded and that []he should therefore be given a chance to reframe." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (alterations and citation omitted) (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)).  If a complaint, however, has substantive problems and "[a] better pleading will not cure [them]," "[s]uch a futile request to replead should be denied." *Id.* (citing *Hunt v. All. N. Am. Gov't Income Tr.*, 159 F.3d 723, 728 (2d Cir. 1998)).  Courts are especially wary of giving plaintiffs multiple "bites at the apple" where a plaintiff has already been granted leave to amend.  *See Anthony v. Brockway*, No. 15-CV-451, 2015 WL 5773402, at *3 (N.D.N.Y. Sept. 30, 2015) ([The] [p]laintiff has already been given one opportunity to amend his complaint . . . , and there is nothing in his second amended complaint suggesting that [he] could do better given another opportunity."); *Al-Qadaffi v. Servs. for the Underserved (SUS)*, No. 13-CV-8193, 2015 WL 585801, at *8 (S.D.N.Y. Jan. 30, 2015) (denying leave to amend where "[the plaintiff] ha[d] already had one chance to amend his [c]omplaint, and there [was] still no indication that a valid claim might be stated if given a second chance"), *aff'd*, 632 F. App'x 31 (2d Cir. 2016); *Bui v. Indus. Enters. of Am., Inc.*, 594 F. Supp. 2d 364, 373 (S.D.N.Y. 2009) (dismissing an amended complaint with prejudice where the plaintiff failed to cure the deficiencies identified in his initial complaint despite "being given ample opportunity to do so").

The gravity and tragic nature of the facts of this case are not lost on the Court.  As the Supreme Court noted in *DeShaney*, "[j]udges and lawyers, like other humans, are moved by

natural sympathy in a case like this to find a way for [Plaintiffs] to receive adequate compensation for the grievous harm inflicted upon them." 489 U.S. at 202–03.  However, the Second Circuit has also observed that "[p]rotective services caseworkers [must] choose between difficult alternatives . . . .  If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights.  If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights."  *Tenenbaum v. Williams*, 193 F.3d 581, 596 (2d Cir. 1999) (alteration and internal quotation marks omitted).  In *DeShaney*, the Supreme Court faced the unenviable task of balancing the desire for recompense for the plaintiffs and deference to the judgment of defendants; the Court will not deviate from that formula here.

As noted, Plaintiffs have already amended their pleadings twice.  (*See* Compl. (Dkt. No. 1); Am. Compl. (Dkt. No. 28); SAC (Dkt. No. 78).)  There is no reason to suspect that, given another opportunity to amend, Plaintiffs will be able to cure the substantive deficiencies in their SAC.  Therefore, the Court dismisses Plaintiffs' federal claims with prejudice.

### III.  Conclusion

For the reasons stated above, Defendants' Motions To Dismiss are granted with prejudice.  As all of Plaintiffs' federal claims have been dismissed, the Court declines to exercise jurisdiction over any remaining state-law claims.  Further, as Plaintiffs assert no federal claims against Defendants Wolfert and Stahli, the Court declines to exercise jurisdiction over the state-law claims against non-moving Defendants.  The state-law claims are thus dismissed without prejudice.

The Clerk of Court is respectfully requested to terminate the pending Motions, (Dkt. Nos. 84, 86, 94), and close the case.

SO ORDERED.

DATED:      March **10**, 2017
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

30